Guido Saveri (22349)
*guido@saveri.com*
R. Alexander Saveri (173102)
*rick@saveri.com*
Cadio Zirpoli (179108)
*cadio@saveri.com*
**SAVERI & SAVERI, INC.**
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

Krishna B. Narine
*knarine@m-npartners.com*
Joel C. Meredith
jmeredith@m-npartners.com
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Telephone: 215-564-5182
Facsimile: 267-687-1628

*Attorneys for the Plaintiff Michael Brooks
and the Putative Indirect Purchaser Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BROOKS, on behalf of himself and all others similarly situated, | **Case No.:** |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| PANASONIC CORPORATION, PANASONIC CORPORATION OF NORTH AMERICA, PANASONIC INDUSTRIAL DEVICES SALES COMPANY OF AMERICA, KOA CORPORATION, KOA SPEER ELECTRONICS, INC., MURATA MANUFACTURING CO., LTD., MURATA ELECTRONICS NORTH AMERICA, INC., ROHM CO. LTD., ROHM SEMICONDUCTOR U.S.A., LLC, VISHAY INTERTECHNOLOGY, INC., YAGEO CORPORATION, and YAGEO AMERICA CORPORATION, | **JURY DEMAND** |
| Defendants. | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION. ...............................................................................1

II.    JURISDICTION AND VENUE. .......................................................6

III.   INTRADISTRICT ASSIGNMENT...................................................8

IV.   PARTIES. ..........................................................................................9

     A.      Indirect Purchaser Plaintiff. ..................................................9

     B.      Defendants. ...........................................................................9

           1.      Panasonic Defendants. ..............................................9

           2.      KOA Defendants.......................................................10

           3.      Murata Defendants....................................................10

           4.      ROHM Defendants. ..................................................11

           5.      Vishay Defendant......................................................11

           6.      Yageo Defendants. ...................................................11

V.     AGENTS AND CO-CONSPIRATORS. ..........................................12

VI.    FACTUAL ALLEGATIONS. ..........................................................12

     A.      Governmental Investigations Of The Resistor Industry By Competition Authorities...........................................................................12

           1.      U.S. Investigations. ..................................................13

     B.      Foreign Investigations..........................................................14

VII.   THE DEFENDANTS CONCEALED THEIR UNLAWFUL CONDUCT....................15

     A.      The Statute of Limitations Did Not Begin to Run Because Plaintiff And Class Members Did Not and Could Not Discover Their Claims. ................................15

     B.      Defendants' Fraudulent Concealment Tolled the Statute of Limitations. ..........16

     C.      The Characteristics of the Resistors Market Render Collusion Plausible Based on Activities. ........................................................17

           1.      The Resistors Industry Has High Barriers to Entry. ...............................18

           2.      The Demand for Resistors Is Inelastic. ...................................19

---

**CLASS ACTION COMPLAINT**            i

3. The Resistors Industry Is Highly Concentrated. .....................................21

4. Resistors Are Homogenous and Commoditized Products. .....................23

5. Sales of Resistors. ....................................................................................24

D. Ability in Industry to Conspire ....................................................................26

1. Defendants Have Ample Opportunities to Conspire And Do Exchange Routinely Sensitive Competitive Information. ........................................26

2. Resistor Manufacturers Had Relationships in Other Price-Fixed Markets…………. ......................................................................................29

E. Motive to Conspire. ......................................................................................29

VIII. DEFENDANTS COLLUDED TO KEEP THE PRICE OF RESISTORS ELEVATED DURING THE CLASS PERIOD. .................................................................................30

IX. GUILTY PLEAS IN PRIOR CASES. .........................................................................30

X. INDIRECT PURCHASERS OF RESISTORS LACKED BUYING POWER. .............31

XI. ANTITRUST INJURY. ...............................................................................................33

XII. AFFECTED TRADE AND COMMERCE. .................................................................34

A. Defendants' Conduct Involved Import Trade or Import Commerce and Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiff's and Class Members' Antitrust Claims .........................................................................................34

B. The Defendants Targeted the United States. ................................................36

XIII. CLASS ACTION ALLEGATIONS. ...........................................................................36

XIV. VIOLATIONS ALLEGED. .........................................................................................40

FIRST CLAIM FOR RELIEF
(Violations of Sherman Act, 15 U.S.C. § 1)
(On Behalf of All Class Members Against All Defendants) ................................................40

SECOND CLAIM FOR RELIEF
(Violations of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq*.)
(On Behalf of All Class Members Against All Defendants) ................................................41

THIRD CLAIM FOR RELIEF
(Violations of California's Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq*.)
(On Behalf of All Class Members Against All Defendants) ................................................43

CLASS ACTION COMPLAINT ii

FOURTH CLAIM FOR RELIEF .......................................................................44
(Violations of New York General Business Law §§ 340, *et seq*.)
(On Behalf of All New York Class Members Against All Defendants)....................44

XV.     REQUEST FOR RELIEF. ...................................................................45

XVI.    JURY DEMAND. .............................................................................46

Plaintiff Michael Brooks ("Plaintiff") brings this action on behalf of itself and all others similarly situated (the "Indirect Purchaser Classes"). Plaintiff alleges facts regarding himself based on his personal knowledge, and upon information and belief as to all other matters. These allegations are also based on the investigations of counsel. Plaintiff seeks damages, injunctive relief, and all other relief available under the federal antitrust laws and the relevant laws of California and New York as set forth herein.

Plaintiff demands a trial by jury, and alleges as follows.

## I.   INTRODUCTION.

1.      Resistors are an essential component of all electronic circuits and are one of the most common electronic components in the world today. Resistors are passive two-terminal electrical components that provide a specific amount of resistance to an electronic circuit. Resistors are often made out of carbon or thin films of carbon or other resistive materials. They can also be made of wires wound around a cylinder.

2.      Resistors fall under the category of passive electronic components, which, unlike active components, can store energy only momentarily and cannot amplify or increase energy in a circuit. In 2014, linear resistors accounted for 45 percent (1.364 trillion pieces) of the global passive electronic components market in terms of volume and 11 percent ($2.6 billion) in terms of value.

3.      Since many electronic components have capacity for more electrical current than is necessary, and additional electrical current may be deleterious, resistors assure that appropriate levels of voltage go to specific parts of an electronic circuit. Resistors act to reduce current flow, and, at the same time, act to lower voltage levels within circuits. In electronic circuits, Resistors are used to limit current flow, to adjust signal levels, bias active elements, terminate transmission lines among other uses. Almost all electronic products—from cellphones to personal computers—contain resistors, often hundreds of them. The following photograph (taken from MicroE's website on "Understanding Electronic Components" (http://www.mikroe.com/old/books/keu/01.htm) shows examples of low-power resistors, *i.e.*,

**CLASS ACTION COMPLAINT**                                                                1

resistors with power dissipation below five watts.



As can be seen, they are typically cylindrical, with wires protruding from each end for connection to a circuit. Examples of higher power resistors with power dissipation above five watts are depicted in the photograph below, which appears on the same website.



4.      Resistors are widely used in a range of industries, including the telecommunications, audiovisual, automotive, and personal and server computing markets. The overall resistor market can be separated into two categories: linear resistors and non-linear resistors. This Complaint concerns the former category of resistors.  In basic terms, a linear resistor is a resistor "in which current produced is directly proportional to the applied voltage." http://www.electricaltechnology.org/2015/01/resistor-types-resistors-fixed-variable-linear-non-linear.html. A linear resistor can be either fixed (with a specific value) or variable. A non-linear resistor is a resistor "whose current does not change linearly with changes in applied voltage." *Id*. In contrast to non-linear resistors, which are used in specialized products, linear resistors are highly standardized.  These two categories can be further broken down by the technology and materials used in the manufacturing process, as illustrated in the diagram below, taken from the same webpage.



5.      Linear resistors represent the largest category of resistors.  The various types of

linear resistors are schematized in the following diagram.



6.      The thick film chip resistor is considered to be the mainstay of the resistor industry. As Defendant Yageo Corporation explains at length on its website (http://www.yageo.com/portal/product/product.jsp?SWITCH_CATEGORY=/product/Rchip/Chip%20Resistor), these so-called "chip resistors" are for use in "all general purpose applications", consumer electronics (such as mobile phones, personal navigation devices, computers and notebooks, automotive electronic systems, industrial applications, and power/battery/energy systems. As examples, the following photographs illustrate resistors found in a Bluetooth circuit board and a smartphone circuit board.



Common Smart Phone - Resistors

7. Chip resistors are standardized. With a commoditized product, prices naturally fall over time. As a result, manufacturing has migrated from the western countries to Asia.

8. Plaintiff purchased resistors as stand-alone products from distributors that had previously purchased them from Defendants. When purchased as stand-alone products, resistors are directly traceable to the specific manufacturer, because they either bear the Defendants' markings (*e.g.*, name, logo, series) or they are marked with a chemical that permits a "chemical trace" back to the manufacturer.

9. Defendants—the worlds' largest manufacturers of linear resistors— along with other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain or artificially stabilize prices of linear resistors sold in the United Sates.[1] Defendants' conspiracy successfully targeted various individuals and entities that purchased linear resistors from distributors, and those purchasers—*i.e.* the Plaintiff and Class members—paid artificially inflated prices for linear resistors as a result.

10. Discovery of the conspiracy here grew out of the worldwide investigation by competition authorities (including the Antitrust Division of the United States Department of Justice ("DOJ")) of another passive electronic component--capacitors. As in capacitors, the conspiracy involved an electronic component used in a vast variety of applications with

---

[1] "Defendants," refers collectively to the following entities: Panasonic Corporation, Panasonic Corporation of North America, Panasonic Industrial Devices Sales Company of America, KOA Corporation, KOA Speer Electronics, Inc., Murata Manufacturing Co., Ltd., Murata Electronics North America, Inc., ROHM Co. Ltd., ROHM Semiconductor U.S.A., LLC, Vishay Intertechnology, Inc., Yageo Corporation, and Yageo America Corporation.

worldwide sales in the billions of dollars.  As in capacitors, the worldwide investigation of resistors commenced in earnest in 2014.  As in capacitors, it involved dawn raids of business facilities in Japan.  As in capacitors, there was a "whistleblower", who is believed to be Panasonic Corporation of Japan.[2] And, as in capacitors, and as described below, word about the conspiracy was first disseminated by MLex, a highly respected global news organization that specializes in predictive analysis of regulatory risk. *See* http://www.ttiinc.com/object/me-zogbi-2040606.html.

11.     Defendants' conduct violated, and continues to violate, Section One of the Sherman Act (15 U.S.C. §1)  and the antitrust, consumer protection, and unfair competition laws of the States of California and New York.   Plaintiff and the Classes paid artificially inflated prices for resistors, and have thereby suffered antitrust injury to their business or property as a direct result of the anticompetitive and unlawful conduct alleged herein.

## II.     JURISDICTION AND VENUE.

12.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section One of the Sherman Act (15 U.S.C. § 1).  Plaintiff also asserts claims for actual and exemplary damages and injunctive relief pursuant to California's antitrust, unfair competition, and consumer protection laws, as well as New York's antitrust law, and seeks to obtain restitution, recover damages, and secure all other available relief against Defendants for violation of those state laws.  Plaintiff and the Classes also seek attorneys' fees, costs, and other expenses under these laws.

_____

[2] Panasonic Corporation is widely acknowledged--even by defense counsel--to be the amnesty applicant in the DOJ's antitrust leniency program in capacitors. *See* http://www.morganlewis.com/events/~/media/F8B7FE5A81D74CEAB08E1295A075E0A9.ashx In the civil antitrust class action litigation involving capacitors that is pending in this district, Panasonic has not denied that it is the amnesty applicant with respect to the alleged conspiracy involving that group of products.

13.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1137.  This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants; and (ii) Plaintiff's state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

14.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391(b)-(d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

15.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of resistors throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

16.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects

**CLASS ACTION COMPLAINT**                                                                          7

upon interstate commerce within the United States.

17.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce in the United States. Defendants' products are sold in the flow of interstate commerce.

18.     Resistors manufactured abroad by Defendants and sold as stand-alone products that were either manufactured in the United States or manufactured abroad and sold in the United States, are goods brought into the United States for sale and therefore constitute import commerce.  To the extent any resistors are purchased in the United States, and such resistors do not constitute import commerce, Defendants' unlawful conduct with respect thereto, as more fully alleged herein during the respective Class Periods, had and continues to have a direct, substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiff and members of the Classes in the United States.

19.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, and allocate market shares for resistors, which conspiracies unreasonably restrained trade and adversely affected the market for such resistors.

20.     Defendants' anticompetitive conduct adversely affected individuals and entities in the United States, including Plaintiff and members of the Classes, who indirectly purchased resistors as stand-alone products.

## III.     <u>INTRADISTRICT ASSIGNMENT.</u>

21.     Intradistrict assignment to the San Jose Division is appropriate.  Defendants ROHM Semiconductor U.S.A., LLC and Yageo America Corporation have offices in San Jose.  Moreover, the conduct at issue adversely the technology industry, the heart of which is in Silicon Valley in and around San Jose.  For these reasons, assignment to the San Jose Division is appropriate.

## IV. **PARTIES.**

### A. **Indirect Purchaser Plaintiff.**

22.     Plaintiff **Michael Brooks** is a California resident who purchased resistors as a stand-alone product made by one or more Defendants from a distributor during the Class Period.  Michael Brooks purchased during the Class period resistors manufactured by several of the Defendants.  Michael Brooks has been injured and is threatened with further injury as a result of the violations alleged in this Complaint.

### B. **Defendants.**

#### 1.     **Panasonic Defendants.**

23.     Defendant **Panasonic Corporation** ("Panasonic") is a Japanese corporation with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  Panasonic is one of the world's leading manufacturers of resistors.  Panasonic—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

24.     Defendant **Panasonic Corporation of North America** ("PNA"), a wholly owned subsidiary of Panasonic, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102.  PNA is one of the world's leading manufacturers of resistors.  PNA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

25.     Defendant **Panasonic Industrial Devices Sales Company of America** ("PIDS"), a wholly owned subsidiary of Panasonic, a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102.  PIDS is one of the world's leading manufacturers of resistors.  PIDS—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class

1  Period.

2        **2.**    **KOA Defendants.**

3        26.    Defendant **KOA Corporation** ("KOA") is a Japanese corporation with its

4  principal place of business located at 2-17-2 Midori-Cho, Fuchu-Shi, Tokyo 183-0006, Japan.

5  KOA is one of the world's leading manufacturers of resistors. KOA—directly and/or through

6  its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or

7  sold resistors that were purchased throughout the United States, including in this District,

8  during the Class Period.

9        27.    Defendant **KOA Speer Electronics, Inc.** ("KOA Speer") is a Delaware

10  corporation with its principal place of business located at 199 Bolivar Drive, Bradford,

11  Pennsylvania 16701.  KOA Speer is one of the world's leading manufacturers of resistors and

12  is a wholly owned subsidiary of KOA.  KOA Speer—directly and/or through its subsidiaries,

13  which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that

14  were purchased throughout the United States, including in this District, during the Class

15  Period.

16        **3.**    **Murata Defendants.**

17        28.    Defendant **Murata Manufacturing Co., Ltd.** ("Murata") is a Japanese

18  corporation with its principal place of business located at 10-1, Higashikotari 1-chome,

19  Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata is one of the world's leading manufacturers

20  of resistors. Murata—directly and/or through its subsidiaries, which it wholly owned and/or

21  controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the

22  United States, including in this District, during the Class Period.

23        29.    Defendant **Murata Electronics North America, Inc.** ("MNA") is a wholly

24  owned subsidiary of Murata Manufacturing Co., Ltd., a Texas corporation with its principal

25  place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MNA is

26  one of the world's leading manufacturers of resistors. MNA—directly and/or through its

27  subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold

28

**CLASS ACTION COMPLAINT**                                                    10

resistors that were purchased throughout the United States, including in this District, during the Class Period. Indeed, MNA maintains teams of Technical Sales Managers in several major hubs across the United States, including Silicon Valley and San Jose.

### 4. ROHM Defendants.

30. Defendant **ROHM Co., Ltd.** ("ROHM") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-Ku, Kyoto 615-8585, Japan. ROHM is one of the world's leading manufacturers of resistors. ROHM—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

31. Defendant **ROHM Semiconductor U.S.A., LLC** ("ROHM USA") is a Delaware limited liability corporation with its principal place of business located at 2323 Owen Street, Suite 150, Santa Clara, California 95054. ROHM USA is one of the world's leading manufacturers of resistors, and is a wholly owned subsidiary of ROHM. ROHM USA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

### 5. Vishay Defendant.

32. Defendant **Vishay Intertechnology, Inc.** ("Vishay") is a Delaware corporation with its principal place of business located at 63 Lancaster Avenue, Malvern, Pennsylvania 19355. Vishay is one of the world's leading manufacturers of resistors. Vishay—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

### 6. Yageo Defendants.

33. Defendant **Yageo Corporation** ("Yageo") is a Taiwanese corporation with its principal place of business located at 3F, 233-1, Baoqiao Rd. Xindian Dist., New Taipei City

23145, Taiwan. Yageo is one of the world's leading manufacturers of resistors. Yageo—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

34.    Defendant **Yageo America Corporation** is a Delaware corporation with its principal place of business located at 2550 North First St., Suite 480, San Jose, CA 95131. Yageo America Corporation is one of the world's leading manufacturers of resistors. Yageo America Corporation—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold resistors that were purchased throughout the United States, including in this District, during the Class Period.

## V.    AGENTS AND CO-CONSPIRATORS.

35.    Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

36.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiff reserves the right to name some or all of these persons and entities as Defendants at a later date.

37.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## VI.    FACTUAL ALLEGATIONS.

### A.    Governmental Investigations Of The Resistor Industry By Competition

**Authorities.**

    1.    **U.S. Investigations.**

38.    The present Complaint springs from the fact that the resistor industry is under investigation for antitrust violations by domestic and international competition authorities for antitrust violations.

39.    A report in MLex issued on July 22, 2015 stated the following:

> The US Department of Justice is investigating allegations of price-fixing in the resistors industry, MLex has learned.
>
> Resistors are fundamental parts of an electrical circuit that help reduce the flow of current. Trillions of them are sold every year, and they are used by any product that needs electricity from smartphones to coffeemakers.
>
> A spokesman for the Justice Department declined to comment.
>
> The investigation is understood to be an offshoot of the DOJ's investigation into capacitors, which began in 2014. Eight Japanese companies, including Panasonic and Hitachi Chemical, have acknowledged being contacted by US or other antitrust authorities in connection with the capacitor probe, though none have yet faced sanctions or charges.
>
> Japan's Panasonic is understood to have approached DOJ's antitrust division, seeking leniency related to resistors. The DOJ's leniency program grants complete immunity from prosecution to the first company that admits involvement in a price-fixing conspiracy and agrees to cooperate.
>
> Akira Kadota, a spokesman for Panasonic in Tokyo, declined to comment.

40.    In addition to Panasonic, ROHM, Vishay, Yageo, Murata, and KOA Speer all manufacture capacitors.

41.    The MLex report is consistent with Panasonic's own statements. In its 2012 Form 10-K filed with the Securities & Exchange Commission, Panasonic said that it was cooperating with governmental competition authorities in a number of investigations that were

---

**CLASS ACTION COMPLAINT**    13

not identified.[3] While there is no basis for knowing whether the investigation into resistors was one of those back in 2012, the statement certainly supports the conclusion that Panasonic would be the amnesty applicant in the DOJ's leniency program with respect to resistors, just as it was with respect to capacitors.

42.     Panasonic's application for amnesty in connection with resistors is highly significant. As explained on the DOJ's website:

> **5. *Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?***
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter….
>
> A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of a criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency.[4]

**B. <u>Foreign Investigations</u>**

43.     The DOJ was not the only competition authority investigating the resistor industry. *Global Legal Insights* reported that in June of 2014, the Japanese Fair Trade Commission conducted on-site inspections of manufacturers in connection with an investigation into resistors; the investigation was not confined to domestic procurement in

---

[3]http://www.sec.gov/Archives/edgar/data/63271/000119312512286456/d230958d20f.htm#tx230 958_6.

[4] http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program.

Japan.[5] The Korean Fair Trade Commission also reportedly conducted an on-site investigation of suspected price fixing in the market for resistors.

## VII.    THE DEFENDANTS CONCEALED THEIR UNLAWFUL CONDUCT.

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiff And Class Members Did Not and Could Not Discover Their Claims.

44.    Plaintiff and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) June of 2015, when reports of the investigations into anticompetitive conduct concerning resistors were first publicly disseminated.

45.    Plaintiff and Members of the Classes are purchasers who purchased resistors manufactured by a Defendant from a distributor. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before June of 2015, when reports of the investigations into anticompetitive conduct concerning resistors were first publicly disseminated.

46.    No information in the public domain was available to Plaintiff and members of the Classes prior to the public announcements of the government investigations beginning in June of 2015 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to fix prices for resistors.

47.    Publicly, some Defendants repeatedly and expressly stated throughout the Class Period, including on their websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion seen in this litigation.

48.    It was reasonable for members of the Classes who may have been exposed to these public policies to believe that the Defendants were enforcing the policies.

49.    For these reasons, the statute of limitations as to Plaintiff's and the Classes'

---

[5] http://www.globallegalinsights.com/practice-areas/cartels/cartels-3rd-edition/japan.

claims did not begin to run, and has been tolled with respect to the claims that Plaintiff and members of the Classes have alleged in this Complaint.

**B.**     **Defendants' Fraudulent Concealment Tolled the Statute of Limitations.**

50.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Classes.  Plaintiff and the members of the Classes had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until news sources first reported in June of 2015 that the DOJ was conducting a probe into anticompetitive conduct among resistors manufacturers.  Prior to that date, no information in the public domain or available to the Plaintiff and the Classes suggested that any Defendant was involved in a criminal conspiracy to fix prices for resistors.

51.     Plaintiff exercised reasonable diligence.  Plaintiff and the Classes could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

52.     Before that time, Plaintiff and members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices for resistors throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiff that even hinted to Plaintiff that they were being injured by Defendants' unlawful conduct.

53.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

54.     Defendants used mechanisms designed to conceal their collusion, such as covert meetings, use of code words or terms to refer to competitors and/or customers, use of pretexts to mask the true purpose of collusive communications, use of non-company phones, and instructions to destroy emails evidencing collusive activities.

55.     By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing. Resistors are not exempt from antitrust regulation, and thus, before June of 2015, Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' resistors prices before June of 2015.

56.     Plaintiff and members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

57.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until June of 2015, when reports of the investigations into anticompetitive conduct concerning resistors were first publicly disseminated.

58.     For these reasons, the statute of limitations applicable to the claims of Plaintiff and members of the Classes was tolled and did not begin to run until, at the earliest, June of 2015.

**C.      The Characteristics of the Resistors Market Render Collusion Plausible Based on Activities.**

59.     The characteristics of the resistors industry in the United States are conducive to price-fixing and have made collusion plausible.  Collusion is more plausible in industries where: (1) high barriers to entry exist; (2) demand is inelastic; (3) the market is highly concentrated; (4) the products are homogenous; (5) there are ample opportunities to conspire; (6) purchasers lack buying power; and (7) there is a history of collusive behavior.

### 1.   **The Resistors Industry Has High Barriers to Entry.**

60.    The resistors industry has high barriers to entry that facilitate the formation and maintenance of a cartel.  Collusion between manufacturers that effectively increases product prices above competitive levels would attract new entrants seeking to benefit from supra-competitive pricing.  New entrants are less likely, however, where there are significant barriers to entry.

61.    There are substantial barriers that preclude, reduce, or make more difficult entry into the resistors market.  One industry analyst stated that "[o]nly through massive economics of scale is it possible to achieve profitability in the thick film chip resistor markets…."

62.    A potential new entrant faces costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, distribution infrastructure, skilled labor, and long-standing customer relationships with existing manufacturers.

63.    Resistors are expensive to manufacture.  The cost to create the appropriate manufacturing facilities for resistor manufacturing are also very high and prohibitive to new entrants breaking into the market. For instance, in 2011, KOA Corporation planned to invest 2.3 billion Japanese yen in the construction of a new resistors facility, a figure that does not even account for expenses associated with land acquisition and production.

64.    In order to compete in the market for resistors, suppliers must also have access to sophisticated technology, technical expertise, and funding for investment in technological development. In its 2014 SEC Form 10-K, Vishay acknowledges the importance of continued investment and development in the market for resistors: "To continue to grow our business successfully, we need to continually develop, introduce, and market new and innovative products, modify existing products, respond to technological change, and customize certain products to meet customer requirements."

65.    New entrants may also be deterred from entering the resistor market due to the need for a large product portfolio. In its 2014 SEC Form 10-K, Vishay claims to have "one of the broadest

**CLASS ACTION COMPLAINT**                                                                                 18

product lines of discrete semiconductors and passive components among our competitors. Our broad product portfolio allows us to penetrate markets in all industry segments and all regions, which reduces our exposure to a particular end market or geographic location. The company also noted that their ability "to provide 'one-stop shop' service to customers" allows customers to "streamline their design and purchasing processes by ordering multiple types of products from Vishay" and that they "aim to use this broad portfolio to increase opportunities to have our components selected and 'designed in' to new end products."

## 2.   **The Demand for Resistors Is Inelastic.**

66.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.

67.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

68.    Demand for resistors is highly inelastic because there are no close substitutes for these products.  The demand for resistors will continue to rise due to increasing use of personal computers ("PCs"), notebooks, ultrabooks, smartphones, and other consumer and electronic products in day-to-day life.  No other type of passive electrical component (*e.g.*, inductors and capacitors) can serve as a substitute or a functional equivalent to a resistor in an electric circuit.  Accordingly, a purchaser that is either an Original Equipment Manufacturer ("OEM") or an Electronic Manufacturing Services ("EMS") provider cannot easily design an electric circuit to bypass its need for a resistor with a certain resistance. When there are few or no substitutes for an input, purchasers have little choice but to pay higher prices in order to produce their product.

69.    The pricing of linear resistors was relatively flat between 2007 and 2011.

**CLASS ACTION COMPLAINT**                                                                    19

1  During this time period, demand for linear resistors has generally increased, and has thus been

2  relatively inelastic.  Demand for resistors also did not fluctuate in response the recession of

3  2008 or the earthquake and flooding in Asia that occurred in 2011.

4

5

6

7

8

9

10

11

12

13

14

15



16

17

18

19

20

21

22

23

24

25

26

27

28



**CLASS ACTION COMPLAINT**                                                                    20

70.     These pricing patterns are not explained by raw material costs. As noted on the website of distributor TTI (http://www.ttiinc.com/object/me-zogbi-20140203.html), raw material costs for passive electronic components (including resistors) have, on average, declined. Such costs fell precipitously in 2011 and have been on a downward trend since:



MONTHLY PASSIVE COMPONENT INDEX
Average Collective Pricing For Passive Electronic Components Raw Materials By Month: 2010-2014

### 3.     The Resistors Industry Is Highly Concentrated.

71.      Market concentration facilitates collusion.  Collusive agreements are easier to implement and sustain when there are few firms controlling a large portion of the market. Practical matters such as coordinating cartel meetings and exchanging information are much simpler with a small number of players.  If the participants can coordinate pricing decisions, their control over total industry output may result in prices that are elevated across the industry. Moreover, their high degree of control also simplifies their coordination issues because there is little outside competitive presence to undermine the cartel.  With fewer firms in the market, the transitory bump in profits that could be achieved by undercutting the cartel price and gaining a

---

**CLASS ACTION COMPLAINT**                                                                                   21

transitory increase in market share would be outweighed by the greater long-term market share for a colluding firm in a concentrated industry.

72.     By contrast, if an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

73.     The resistor industry, like the capacitor industry, has matured through a few major companies acquiring smaller competitors. The following chart from the website of TTI (http://www.ttiinc.com/object/me-zogbi-20140731.html) depicts this development:



74.     Because the resistors market is dominated by a few companies who control the lion's share of the markets, the continuing agreements, understandings, combinations or

conspiracies to fix, raise, maintain and/or stabilize prices, and to allocate market shares for resistors are effective at setting the prices of resistors at artificially high, supra-competitive prices. The following chart from the report "Resistors 2014: World Markets, Technologies & Opportunities: 2014-19" (Paumanok Publications 2014) summarizes the concentration of the resistor industry.

**Linear Resistor Manufacturers**
*FY 2014 Estimated Global Market Shares*

| Vendor | Market Share | HHI | SMD Chip | Networks/ Arrays/IPD | Throughole |
|--------|--------------|-----|----------|----------------------|------------|
| Vishay | 24% | 576 | O | O | O |
| KOA | 17% | 289 | O | O | O |
| Yageo | 10% | 100 | O | O | O |
| ROHM | 7% | 49 | O | O | O |
| Panasonic | 6% | 36 | O | O | O |
| TT Electronics | 6% | 36 | | O | O |
| Hokuriku | 5% | 25 | O | O | |
| Walsin | 5% | 25 | O | O | |
| Others | 20% | 20 | | | |
| Total | 100% | 1156 | 7 | 8 | 6 |

75.     A concentrated market is more susceptible to collusion and other anticompetitive practices.  The resistors market was concentrated during the respective Class Periods.  In 2014, these eight suppliers accounted for 80 percent of the $2.65 billion global linear resistor market.  In fact, throughout the Class Periods, Defendants collectively maintained high market shares.

### 4.     Resistors Are Homogenous and Commoditized Products.

76.     Homogenous products enhance collusion because they enable manufacturers to more easily negotiate agreement on prices and/or quantities and facilitate monitoring. Resistors are homogenous products or commodities because their characteristics and qualities are essentially uniform across different manufacturers. Although different sub-types of resistors are not interchangeable, within each category, resistors are designed to be interchangeable.

77.     The homogenization of resistors is aided by industry-standard product specifications.  The principal dimensions of product differentiation in resistors are well known

and easily quantifiable. Therefore, resistors can be purchased and sold in large volume quantities by manufacturers and distributors based on common size and technology characteristics. Indeed, manufacturers and distributors maintain very detailed product catalogs and substitution guides that outline rules for swapping out resistors made by other Defendants based on their common characteristics.

78. In economics, a commodity is a basic item or goods used in commerce that is interchangeable with other commodities of the same type. Commodities are most often used as inputs in the production of other goods or services. Product homogeneity facilitates collusion more than product differentiation. Examples of traditional commodities are sugar, wheat, and rubber. As technologies and markets for goods mature, it is more likely to be considered a commodity, at least in its more basic implementations.

79. While there are various forms of linear resistors, the product for which each linear resistor type is used (*e.g.* cell phones, personal computers, and home appliances) are highly standardized. As noted in one 2002 publication, chip resistors are "high volume commodity products."[6] Likewise, the United States Department of Defense concluded in 1998 that "[r]esistors and capacitors are mature, commodity products...."[7]

80. Such standardization allows the production of thick film resistors (the largest category of linear resistors) to be highly automated to yield large amounts of output.

### 5. Sales of Resistors.

81. Once a resistor is manufactured by a vendor, it must be distributed to the

---

[6]https://books.google.com/books?id=OauJoOB8zl4C&pg=PA161&lpg=PA161&dq=chip+resistors+commodity&source=bl&ots=_2elNCRMRO&sig=kLCZCpLJTtOnh9NEBKMW5o5AqbY&hl=en&sa=X&ved=0CDcQ6AEwBGoVChMIx5W-8qbFxwIVDzOICh11EwLo#v=onepage&q=chip%20resistors%20commodity&f=false.

[7]http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=12&ved=0CCMQFjABOApqFQoTCP2ahcrGxccCFdKWiAod8vMD0g&url=http%3A%2F%2Fhandle.dtic.mil%2F100.2%2FADA399281&ei=QBDdVf36MtKtogTy54-QDQ&usg=AFQjCNFGzF_rvADVfnN-Ws4vExtyAE3g_A.

1   customer.  Resistor sales are made either directly to an OEM or to an EMS, or they are sold

2   through an authorized distributor (*e.g.* TTI, Digi-Key, Future, Arrow, Avnet, or WPG).  In the

3   Americas and Europe, distributors now account for slightly more than half of regional sales.

4   This type of distribution network is made possible by the fact that resistors are highly

5   standardized.  This further enables resistors to be purchased in large quantities by distributors

6   and then sold by those distributors based on common size and characteristics.

7       82.    Resistors straddle the line between traditional commodities and emerging

8   commodities because the resistors market is still developing.  As resistors are in almost every

9   electronic device—and as the electronic device market is expanding due to the exponential

10  growth in computing technology—the established resistors market is still evolving.

11      83.    The United Nations ("UN") Commodity Trade Statistics Database, the largest

12  depository of international trade data, includes resistors on its Commodity List.  Over 170

13  reporting countries provide the UN Statistics Division with their annual international trade

14  statistics data detailed by commodities and partner countries.  The UN and UN member

15  countries therefore consider resistors as commodities.



http://comtrade.un.org/db/mr/rfCommoditiesList.aspx?px=H1&cc=8533

84.     Furthermore, according to some market analysts, the ubiquity of smartphones and personal computers and the consistency of features from one brand to another means that the products are becoming commodities.  The commoditization of smartphones and personal computers has increased the commoditization of resistors.

85.     Markets for commodity products are conducive to collusion.  Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service.  This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

**D.  Ability in Industry to Conspire**

**1.     Defendants Have Ample Opportunities to Conspire And Do Exchange Routinely Sensitive Competitive Information.**

86.     Trade associations provided opportunities for Defendants to meet frequently and exchange information to facilitate collusion.  Defendants are members of a number of trade associations in the United States, Asia and Europe.  Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor one another's activities in the capacitor market and punish non-compliance.  Defendants' participation in trade associations, as described above, helped facilitate their collusion.

87.     One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia.  Several of the Defendants are members of this organization, including KOA Speer, PIDS, ROHM USA, Vishay and Yageo America.  They regularly meet to discuss matters of mutual concern. As the website of the ECIA states:

ECIA provides resources and opportunities for members to improve their business performance while enhancing the industry's overall capacity for growth and profitability. From driving critical conversations and process optimization to product authentication and industry advocacy, ECIA is your trusted source for support, insight and action.

Bringing together the talent and experience of broad array of industry leaders and professionals representing all facets of the electronics components supply chain, ECIA is uniquely positioned to enable individual connection as well as industry-wide collaboration. As the supply chain becomes increasingly more complex, ECIA serves as a vital nexus for refinement and progress.

https://www.ecianow.org/about-ecia/what-we-do/.

88. For manufacturers, the ECIA promises access to "[d]ata & statistics for better decision-making (Executive summaries, confidence surveys, end market reports, etc.)", the opportunity to "[s]hape opinion and direction by participating on Councils and Committees that design, develop, and publish processes the industry will follow" and "[n]etworking among the industry leaders (…can't have enough professional relationships!)." https://www.ecianow.org/join-ecia/manufacturer/.

89. The data and statistics mentioned by ECIA are significant. For the resistors market, ECIA prepares monthly sales and booking reports for chip resistors, passive networks and carbon and metal film resistors. https://www.ecianow.org/north-america-sales-booking-reports/. The ECIA also has a Statistics and Industry Data Council, the role of which is defined as follows:

The Statistics and Industry Data Council oversees several programs that collect and provide unique industry data. These include commodity and market segment level sales trends as well as discrete passive electronic components market reports. The primary outputs are the Electronic Component Sales Trends survey (ECST) and the MS Series, a collection of 13 individual reports on capacitors, resistors, and inductors that include world statistics.

https://www.ecianow.org/about-ecia/councils/statistics-industry-data-council/. The same webpage goes on to list among "2014 accomplishments" that the Statistics and Industry Data Council "[c]ompiled and published more than 100 statistics reports (MS series) on *North American Sales and Booking* for capacitors, resistors and inductors plus monthly reports on

world statistics for capacitors and quarterly reports for world statistics for resistors and inductors." Within the council is the "Passive Components Market Services Working Group," of which MNA and KOA Speer are members.

90.     By virtue of their membership in such organizations, Defendants have the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  ECIA, for example, hosts an annual "Executive Conference."  The 2014 conference was held in Chicago, Illinois, and the 2015 conference is also scheduled to be held in Chicago on October 25-27, 2015. ECIA also hosts an "EDS Summit" that includes electronic component manufacturers "where valuable idea exchange can happen through high-level strategic meetings, event functions and informal gatherings." https://www.ecianow.org/connection-points/eds/.  Next year's EDS Summit will take place on May 13-16, 2016 in Las Vegas, Nevada.

91.     In Japan, there exists the Japan Electronics and Information Technology Industries Association ("JEITA"), of which Panasonic, KOA, Murata and ROHM are members. JEITA conducts an annual conference described as follows: "[a]ll JEITA member companies gather annually for a conference that serves as the industry's premier decision-making forum. "

http://www.jeita.or.jp/english/about/orga/index.htm.  Its Board of Directors "discusses and makes decisions concerning important issues related to JEITA's activities, including items raised at the Annual Conference." *Id*. JEITA has created five sector-specific boards including an Electronics Component Board. One of the current Vice-Chairmen of the Electronic Components Board is Tsuneo Murata, the President of Murata. As of July 22, 2015, the Vice Chairman of JEITA is Shusaku Nagae, Chairman of the Board of Panasonic. JEITA maintains an office in Washington, D.C.

92.     Trade associations and other common forums facilitated Defendants' collusion. Trade association meetings provide an excellent cover for meeting and communicating about the pricing of resistors and to conspire to fix, raise, maintain and/or stabilize prices, and to

**CLASS ACTION COMPLAINT**                                                                                28

allocate market shares for resistors.

### 2. Resistor **Manufacturers Had Relationships in Other Price-Fixed Markets.**

93.     Most of the resistor manufacturers also produce several other types of components, not just resistors. As noted above, the Defendants all manufacture capacitors, which are the subject of worldwide cartel investigations. Similarly, Panasonic produced lithium ion batteries, cathode ray tubes, capacitors and optical disk drives.

### E. **Motive to Conspire.**

94.     Because resistors are commodities, price is the most obvious differentiation among them for purchasers.  In a market of this nature, with trillions of components being manufactured and sold a year at relatively inexpensive individual prices, there is a huge incentive to fix, stabilize, maintain and raise the prices of the components to supra-competitive levels through illegal conspiratorial agreements.  By foregoing competition, each manufacturer could still guarantee themselves massive profits in such a high volume market.  This anticompetitive conspiracy causes substantial harm to consumers, to competition, and to United States commerce.

## VIII.  **DEFENDANTS COLLUDED TO KEEP THE PRICE OF RESISTORS ELEVATED DURING THE CLASS PERIOD.**

95.     As alleged in this Complaint, Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of resistors throughout the Class Period.  Defendants' acts, practices, and course of conduct in furtherance of their conspiracy evolved over time and included, but were not limited to the following: coordinating prices for specific customers and products; engaging in continuous communications on confidential and proprietary business matters to eliminate price competition; allocating market shares; restricting supply of resistors; using input costs as a pretext for industry-wide pricing formulas; and concocting mechanisms to nullify competitive sales processes to their customers.

96.     Defendants effectively moderated and even negated the downward pressure on

---

**CLASS ACTION COMPLAINT**                                                                 29

resistor prices caused by price competition, oversupply, product life-cycles, technological advancements, and demand reduction.

## IX.    GUILTY PLEAS IN PRIOR CASES.

97.    Significantly Panasonic, one of the world's leading manufacturers of resistors, has pled guilty in numerous price-fixing cases, including electronic products.

98.    On September 30, 2010, Panasonic agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from October 14, 2004 through December 31, 2007.

99.    On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere from at least as early as September of 2003 until at least February of 2010.

100.    That same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to fix the prices of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery packs from about April 2007 until about September 2008.  The production and sale of resistors were often overseen by the same departments and personnel that were involved in fixing lithium ion battery prices.

101.    In 2008, Panasonic created "Rules Concerning Activity and Relationship with Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that meets annually was set up to monitor these efforts. The rules did not solve the problem. In its 2012 corporate "Sustainability Report," Panasonic stated:

> In fiscal 2012, the company reviewed the efforts related to the company's compliance activities in the corporate "Compliance Committee" and discussed additional personnel measures. The top management strongly restated that it is the company's policy not to engage in cartel activities and requests employees mainly in sales and marketing departments to confirm whether they encounter suspicious activities or not.

https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf. The same report noted that Panasonic had created a Global & Group Risk Management Committee chaired by the President of the company and including directors and executive officers in charge of corporate operational functions at the company's headquarters. That group identified the "corporate major risks" for the then just-ended fiscal year 2012 and the then upcoming fiscal year 2013. On both lists was "Cartels." Subsequent corporate sustainability reports for 2013, 2014 and 2015 identified this same "corporate major risk' for the 2013, 2014 and 2015 fiscal years, as well as the 2016 fiscal year.[8]

102.    The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of Defendants' corporate conduct, which has included illegal activity aimed at generating profits at the expense of their customers.

## X.    INDIRECT PURCHASERS OF RESISTORS LACKED BUYING POWER.

103.    Standard economic theory holds that when there are many buyers in a market for a particular good, that good is more susceptible to effective cartel behavior. The incentive for cartel members to undercut the conspiracy is lower when there are many smaller purchasers because while each potential sale is small, disrupting the cartel can carry large penalties. A cartel member is thus incentivized to avoid the collapse of the entire price-setting agreement, and the loss of the supra-competitive profits on all sales in that market when there are many buyers. Conversely, a cartel's ability to raise prices can be thwarted in markets where buyers have significant negotiating power with sellers.

104.    Resistors manufacturers sell their products to companies in audio-visual, communications, computers, peripherals, and home electronics businesses. The largest



consumer of resistors is the telecommunications industry (29%), followed by the computers and consumer audio-visual industry.

105.     Direct purchasers of resistors are generally distributors.  Except for a few tier 1 OEMs, most OEMs and EMS providers that make equipment for OEMs generally buy resistors from distributors.  There are very few large OEMs who possess buying power and as to those companies, Defendants were motivated to conspire amongst themselves to keep bid prices high to avoid cutthroat price competition that would harm them all.  Plaintiff and Class members here are indirect purchasers that bought resistors from distributors and incorporated those resistors into other products.  Large numbers of buyers with little buying power, both at the primary level (*i.e.* distributors) and the secondary level (*i.e.* individuals and entities that purchased from distributors) is the general rule in the resistors industry.

106.     As set forth above, both direct and indirect purchasers in the resistor market lacked buying power.  Since there were many purchasers of resistors, it would have been easier to form and maintain the cartel.  This is because a large number of buyers would have made it less likely that Defendant manufacturers would have cheated on the agreement to artificially inflate prices, because the loss of supra-competitive profits on their sales of resistors outweighed the potential additional profits of raising sales to a handful of modestly-sized customers.

107.     The market for resistors in the United States accounts for a significant portion of the global resistor market.  It is currently estimated at about $959 million.  The Americas therefore account for about 23 percent of the global market at present.



**Source: United States International Trade Commission (USITC)**

**XI.    ANTITRUST INJURY.**

108.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to resistors;

(b)    The prices of resistors have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Indirect purchasers of resistors have been deprived of free and open competition; and

(d)    Indirect purchasers of resistors, including Plaintiff, paid artificially inflated prices.

109.    During the respective Class Periods, Plaintiff and the Classes paid supra-competitive prices for resistors.

110.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Classes have sustained injury to their businesses or property, having paid higher prices for resistors than they would have paid in the absence of Defendants' illegal contract,

combination, or conspiracy, and as a result have suffered damages.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## XII.  AFFECTED TRADE AND COMMERCE.

111.   During the Class Period, Defendants collectively controlled the vast majority of the market for resistors, both globally and in the United States.

112.   Defendants PIDS, KOA Speer, MNA, ROHM USA, Vishay and Yogeo America manufactured and/or sold resistors in the United States

113.   Defendants, directly and indirectly, sold resistors to manufacturers and consumers located in numerous states in the United States other than states in which Defendants are located.  Substantial quantities of resistors containing resistors are shipped from outside the United States into the United States, and are shipped interstate in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

114.   In addition, substantial quantities of equipment and supplies necessary to the production and distribution of resistors, as well as payments for resistors and related products sold by Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of resistors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

### A.  Defendants' Conduct Involved Import Trade or Import Commerce and Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiff's and Class Members' Antitrust Claims

115.   Defendants' illegal conduct involved United States import trade or import commerce. Defendants knowingly and intentionally sent price-fixed resistors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues.   In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed resistors to enter the United States market and inflating the prices of resistors destined for the

United States.  Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

116.    The United States resistors market is enormous. Defendants and others shipped millions of resistors, including those incorporated into finished products, into the United States during the respective Class Periods for ultimate resale to United States consumers.  As a result, a substantial portion of Defendants' revenues were derived from the United States market. Defendants spent hundreds of millions of dollars on advertising their products in the United States.

117.    Because of the importance of the United States market to Defendants and their co-conspirators, resistors intended for importation into and ultimate consumption in the United States were a focus of Defendants' illegal conduct. Defendants knowingly and intentionally sent price-fixed resistors into a stream of commerce that led directly into the United States. This conduct by Defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for resistors.

118.    During the Class Period, every Defendant shipped resistors directly into the United States.

119.    When high-level executives within Defendants' companies agreed on prices, they knew that their price-fixed resistors would be sold in the United States.

120.    For the reasons set forth above, Defendants' illegal conduct involved import trade or import commerce into the United States.

121.    Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce in the form of higher prices for resistors and electronic products containing resistors that Plaintiff and Members of the Classes paid. These prices, tainted by collusion, directly and immediately impacted Plaintiff and Members of the Classes in the United States. In this respect, the United States effects of Defendants' illegal conduct gave rise to Plaintiff's and Members of the Classes' antitrust claims and were the proximate cause of the injury that Plaintiff and Members of the Classes

1    suffered.

2        122.    A number of facts demonstrate that Defendants' price-fixing conspiracy had a

3    direct, substantial and reasonably foreseeable effect on domestic commerce.

4            **B.   The Defendants Targeted the United States.**

5        123.    Because of the small size of resistors, transportation costs are relatively minor

6    and there is substantial international trade in these electronic components.

7        124.    During the Class Period, Defendants manufactured and sold substantial

8    quantities of resistors shipped from outside the United States and from other states in a

9    continuous and uninterrupted flow of interstate and foreign trade and commerce.  In addition,

10   substantial quantities of equipment and supplies necessary to the production and distribution of

11   resistors, as well as payments for resistors and related products sold by Defendants, traveled in

12   interstate and foreign trade and commerce.  The business activities of Defendants in connection

13   with the production and sale of resistors that were the subject of the charged conspiracy were

14   within the flow of, and affected substantially, interstate and foreign trade and commerce.

15       125.    Defendants engaged in conduct both inside and outside the United States that

16   caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects

17   upon interstate commerce within the United States.

18       126.    Defendants, directly and through their agents, engaged in a conspiracy to fix or

19   inflate prices of resistors that restrained trade unreasonably and affected adversely the market

20   for resistors.   Defendants affected commerce, including import commerce, substantially

21   throughout the United States, proximately causing injury to Plaintiff and members of the

22   Classes.

23   **XIII.   CLASS ACTION ALLEGATIONS.**

24       127.    Plaintiff brings this action on behalf of itself and as a class action pursuant to

25   Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive

26   relief on the following classes ("Nationwide Injunctive Class"):

27

28

**CLASS ACTION COMPLAINT**                                                        36

All persons and entities in the United States who purchased one or more linear resistor(s) from a resistor distributor not for resale which a Defendant, its current or former subsidiary, or any of its co-conspirators from a date presently unknown to Plaintiff and going through such time as the anticompetitive effects of Defendants' conduct ceased.

128.    Plaintiff will seek certification of a nationwide class of purchasers under California law pursuant to Rules 23(a) and (b)(3) as follows ("California Nationwide Damages Class):

All persons and entities in the United States who purchased one or more linear resistor(s) from a resistor distributor not for resale which a Defendant, its current or former subsidiary, or any of its co-conspirators from a date presently unknown to Plaintiff and going through such time as the anticompetitive effects of Defendants' conduct ceased.

129.    Plaintiff will also seek certification of statewide linear resistor damages classes, asserting claims of damages under the antitrust and restraint of trade laws of California ("California Statewide Damages Classes") pursuant to Rule 23, as follows:

All persons and entities in California who purchased one or more linear resistor(s) from a resistor distributor not for resale which a Defendant, its current or former subsidiary, or any of its co-conspirators from a date presently unknown to Plaintiff and going through such time as the anticompetitive effects of Defendants' conduct ceased.

130.    Plaintiff will also seek certification of a linear resistor damages classes, asserting claims of damages under the antitrust and restraint of trade laws of New York ("New York Statewide Damages Class") pursuant to Rule 23, as follows:

All persons and entities in California who purchased one or more linear resistor(s) from a resistor distributor not for resale which a Defendant, its current or former subsidiary, or any of its co-conspirators from a date presently unknown to Plaintiff and going through such time as the anticompetitive effects of Defendants' conduct ceased.

131.    The Injunctive Class, California Nationwide Damages Class, and the California and New York Statewide Damages Classes are collectively referred as the "Classes" unless otherwise indicated.  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Defendants' attorneys in this case, federal

government entities and instrumentalities, states and their subdivisions, all judges assigned to this case, all jurors in this case, and all persons and entities who directly purchased linear resistors from Defendants.

132.    While Plaintiff does not know the exact number of the members of the Classes, Plaintiff believes there are thousands of members in each of the Classes.

133.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendants engaged in a combination and conspiracies among themselves to fix, raise, maintain, and/or stabilize the prices of linear resistors sold in the United States;

b.    The identity of the participants of the alleged conspiracies;

c.    The duration of the alleged conspiracies and the acts carried out by Defendants in furtherance of the conspiracies;

d.    Whether the alleged conspiracies violated the Sherman Act;

e.    Whether the alleged conspiracies violated the antitrust and restraint of trade laws of California;

f.    Whether the alleged conspiracies violated the unfair competition and consumer protection laws of California;

g.    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and members of the Classes;

h.    The effect of the alleged conspiracy on the prices of linear resistors sold in the United States during the respective Class Periods;

i.    The appropriate injunctive and related equitable relief for the Injunctive Classes; and

j.    The appropriate class-wide measure of damages for the State Damages

**CLASS ACTION COMPLAINT**                                                                38

Classes.

134.   Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for linear resistors purchased indirectly from Defendants.

135.   Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

136.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

137.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

138.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

139.   Plaintiff brings the Damages Classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more linear resistors that a Defendant or co-conspirator

manufactured during the respective Class Periods.

## XIV.  VIOLATIONS ALLEGED.

**FIRST CLAIM FOR RELIEF**
**(Violations of Sherman Act, 15 U.S.C. § 1)**
**(On Behalf of Plaintiff and Class Members Against All Defendants)**

140.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

141.    Defendants and unnamed coconspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section One of the Sherman Act (15 U.S.C. § 1).

142.    Beginning at a date presently unknown to Plaintiff and continuing through the present, the exact starting date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

143.    In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the prices of linear resistors

144.    As a result of Defendants' unlawful conduct, prices for linear resistors were raised, fixed, maintained, and stabilized in the United States.

145.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

146.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

> a.  Participating in meetings and conversations to discuss the prices and supply of linear resistors.

b. Communicating in writing and orally to fix prices of linear resistors.

c. Agreeing to manipulate prices and supply of linear resistors sold in the United States in a manner that deprived purchasers of free and open competition.

d. Issuing price announcements and price quotations in accordance with the agreements reached.

e. Selling linear resistors to customers in the United States at non-competitive prices.

f. Providing false statements to the public to explain increased prices for linear resistors.

147. As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Classes have been injured in their businesses and property in that they have paid more for resistors than they otherwise would have paid in the absence of Defendants' unlawful conduct.

148. The alleged contract, combination or conspiracy is a *per se* violation of the federal antitrust laws.

149. These violations are continuing and will continue unless enjoined by this Court.

150. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Classes seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**(Violations of California's Cartwright Act,**
**Cal. Bus. & Prof. Code §§ 16720,** *et seq.***)**
**(On Behalf of Plaintiff And Class Members Against All Defendants)**

151. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

152. By reason of the foregoing, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.* Plaintiff, on behalf of a nationwide class of Indirect Purchasers, alleges as follows.

153.     Beginning at a time currently unknown to Plaintiff and continuing thereafter through the present, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of section 16720, California Business and Professions Code.  Defendants, and each of them, have acted in violation of section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for linear resistors.

154.     As a result of Defendants' unlawful conduct, prices for linear resistors were raised, fixed, maintained, and stabilized in the United States.

155.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

156.     For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

      a.   Participating in meetings and conversations to discuss the prices and supply of linear resistors.

      b.   Communicating in writing and orally to fix prices of linear resistors.

      c.   Agreeing to manipulate prices and supply of linear resistors sold in the United States in a manner that deprived purchasers of free and open competition.

      d.   Issuing price announcements and price quotations in accordance with the agreements reached.

      e.   Selling linear resistors to customers in the United States at non-competitive prices.

      f.   Providing false statements to the public to explain increased prices for linear resistors.

157.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

**CLASS ACTION COMPLAINT**                                                                 42

the members of the California Damages Classes have been injured in their business and property in that they paid more for linear resistors than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, California Plaintiff and the California Indirect Purchaser Classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

158. It is appropriate to apply California antitrust law to purchasers of linear resistors and/or electronic products containing linear resistors in all fifty states—that is, nationwide. Nationwide application of California law is proper because conspiratorial acts occurred in California, and the conspirators targeted their price-fixing activities at large purchasers of linear resistors and/or electronic products containing linear resistors in California, such as Apple Inc. ("Apple"), Intel Corporation ("Intel"), and Hewlett-Packard Company ("H-P").

159. Some Defendants maintained sales and marketing arms in the United States to conduct business with major customers. These Defendants are incorporated, located, and headquartered in the United States, and each does substantial business in domestic interstate commerce throughout the United States.

160. The foreign-based Defendants have no reasonable expectation as to the application of different state laws. Based on Plaintiff's information and belief, California law applies to contracts with California-based companies, such as Apple, Intel, and H-P.

### THIRD CLAIM FOR RELIEF
**(Violations of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**
**(On Behalf of Plaintiff And All Class Members Against All Defendants)**

161. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

162. By reason of the foregoing, Defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

163. Defendants committed acts of unfair competition, as defined by section 17200,

*et seq.*, by engaging in a conspiracy to fix and stabilize the price of linear resistors as described above.

164.   The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) violations of Section 1 of the Sherman Act; and (2) violations of the Cartwright Act.

165.   Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

166.   Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq.*

167.   Defendants' conduct was carried out, effectuated, and perfected within the state of California. Defendants maintained offices in California where their employees engaged in communications, meetings and other activities in furtherance of Defendants' conspiracy.

168.   By reason of the foregoing, the Classes are entitled to application of California law to a nationwide class and are entitled to an injunction to require Defendants to stop the conduct alleged in this Complaint.

**FOURTH CLAIM FOR RELIEF**
**(Violations of New York General Business Law §§ 340, *et seq.*)**
**(On Behalf of All New York Plaintiffs Against All Defendants)**

169.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

170.   By reason of the foregoing, Defendants have violated New York General Business Law §§ 340, *et seq*.

171.   Defendants engaged in a conspiracy to fix and stabilize the price of linear resistors as described above.

172.   The acts, omissions, misrepresentations, practices and non-disclosures of

Defendants, as described above, constitute a common and continuing course of conduct that violates New York General Business Law §§ 340, *et seq.*

173.   Defendants' acts restrained, suppressed and eliminated competition in the sale of linear resistors in the State of New York, deprived Plaintiff and Class members in that state of the benefits of free and open competition for the sale of linear resistors, and caused Plaintiff and Class members in that state to pay supracompetitve, artificially inflated prices for linear resistors that were higher than they would have been absent Defendants' illegal acts.

174.   Defendants' illegal conduct substantially affected New York commerce.

175.   As a direct and proximate result of Defendants' unlawful conduct, New York Plaintiff and Class members in that state have been injured in their business and property and are threatened with further injury.

176.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade on violation of  New York General Business Law §§ 340, *et seq.* Accordingly, New York Plaintiff and Class members in that state seek all relief available under New York General Business Law §§ 340, *et seq.*

## XV.   <u>REQUEST FOR RELIEF.</u>

WHEREFORE, Plaintiff and Class members respectfully request that:

1.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

2.   The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

   (a)   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

   (b)   A *per se* violation of Section 1 of the Sherman Act;

   (c)   An unlawful combination, trust, agreement, understanding, and/or concert

of action in violation of the California's antitrust, unfair competition, and consumer protection laws as set forth herein; and

(d)     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of New York General Business Law §§ 340, *et seq.*

3.      Plaintiff and the members of the Damages Classes recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and the members of the Damages Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Plaintiff and the members of the Damages Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect.

6.      Plaintiff and the members of the Damages Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment.

## XVI.   <u>JURY DEMAND.</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: September 15, 2015

By: /s/ R. Alexander Saveri
Guido Saveri (22349)
guido@saveri.com
R. Alexander Saveri (173102)
rick@saveri.com
Cadio Zirpoli (179108)
cadio@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

Krishna B. Narine
knarine@m-npartners.com
Joel C. Meredith
jmeredith@m-npartners.com
MEREDITH & NARINE
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Telephone: 215-564-5182
Facsimile: 267-687-1628

*Attorneys for Plaintiff Michael Brooks and
the putative Indirect Purchaser Class*